Tawaiin William **LEWIS**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

2014–SC–000223–MR

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

Case Ordered Published by Supreme Court October 29, 2015

Counsels for Appellant: Daniel T. Goyette, Louisville, Joshua Michael Reho.

Counsels for Appellee: Jack Conway, Attorney General of Kentucky, Taylor Allen Payne, Assistant Attorney General.

### OPINION OF THE COURT

Tawaiin Lewis appeals from his convictions of two counts of intentional murder, two counts of assault in the first degree, and one count of wanton endangerment in the first degree. On appeal, he argues that the trial court made five errors warranting reversal of his conviction and one error warranting reversal of his sentencing. Having reviewed the record, we affirm.

### I. BACKGROUND.

On September 23, 2009, Lewis approached an apartment building on Saddlebrook Lane in Louisville, Kentucky. As they often did, Jonte Johnson (Jonte); his cousins, Dejuan Johnson (Dejuan) and Demarcus Johnson (Demarcus); and his friends Quinntin Knighton (Knighton) and Terry Matthews (Matthews) were sitting on the building's porch. When Lewis approached, he had a handgun in his hand and had a short verbal confrontation with the men on the porch. During that confrontation, Seaundre Horsley (Horsley), who was carrying an assault rifle, came around the corner of the building and began firing at the men on the porch. Jonte and Knighton suffered multiple gunshot wounds and died as a result. Demarcus, Dejuan, and Mathews were wounded, but not fatally.[1] The evidence at trial indicated that the fatal wounds to Jonte and

---

1. There is some dispute regarding whether Mathews was wounded by a bullet or whether he suffered an injury while escaping from the scene. Regardless of the source of his injury, its origin is not relevant.

Knighton were from bullets fired by the assault rifle. As to the non-fatal wounds, it was clear that some resulted from assault rifle bullets; however, the source of others was unclear.

Following an investigation, the police arrested both Horsley and Lewis, and charged them with two counts of murder, two counts of attempted murder, two counts of first degree assault, and one count of first degree wanton endangerment. Horsley claimed that he began firing the assault rifle because he thought someone on the porch had a gun and was about to start shooting. The Commonwealth offered to reduce the charges against Horsley to two counts of second degree manslaughter and two counts of second degree assault in exchange for a sentence of 10 years' imprisonment.[2] Horsley accepted the Commonwealth's offer. Lewis proceeded to trial, and a jury found him guilty as set forth above. Consistent with the jury's recommendation, the court sentenced Lewis to life without the possibility of parole for 25 years on the murder convictions, 20 years on each of the assault convictions, and 5 years on the wanton endangerment conviction, all sentences to run concurrently. We set forth additional facts as necessary below.

## II. STANDARD OF REVIEW.

Because the issues raised by Lewis have different standards of review, we set forth the appropriate standard as we address each issue.

## III. ANALYSIS.

### A. The Trial Court Did Not Abuse Its Discretion when It Excluded Horsley's Plea Agreement from Evidence in the Guilt Phase.

As part of his plea agreement, Horsley set forth the following statement of facts:

I was standing in the yard in front of the apartment building at 4908 Saddlebrook Lane on September 23, 2009, around 10:00 pm at night, here in Jefferson County, Kentucky. I was armed with a loaded Assault rifle. Tawaiin "Chum/Chub" Lewis was also standing in the yard. There were individuals on the stoop/porch at that address who were facing out into the yard where I was. When some or all of the five (5) individuals sitting or standing on the stoop/porch made sudden movements, I panicked and thought someone on the stoop/porch might be armed and have the intention of firing at me. I fired my weapon in the direction of the individuals on the porch. Although I did not know who was all on the porch at the time, I am now aware that the firing of the weapon by me caused the death of Quinntin Knighton and Jonte Johnson and injury to Demarcus Johnson and Dejuan Johnson. I am also now aware that Terry Matthews was the fifth individual on the stoop/porch that was put in danger by the firing of my weapon. I left the area after the shooting.

In a pre-trial conference, Lewis argued that the Commonwealth had adopted the above set of facts, and he moved for leave to introduce Horsley's plea agreement into evidence. Lewis wanted to introduce the preceding for two reasons: (1) to show that Horsley only acted wantonly, not intentionally; and (2) to limit his culpability to Horsley's. The Commonwealth objected, arguing that it had not adopted the facts in Horsley's plea agreement. Furthermore, the Commonwealth argued that, even if true, the facts in the plea agreement were irrelevant because the issue

---

**2.** Prior to the sentencing phase, the Commonwealth indicated that it entered into the plea, in part, because it believed it had some evidentiary problems with identifying Horsley.

involved Lewis's mental state, not Horsley's. However, the Commonwealth agreed to stipulate that Horsley had fired the assault rifle and had pled guilty. The court accepted this stipulation and ruled that the plea documents would not be admitted into evidence.

On appeal, Lewis continues to argue that Horsley's plea and statement of facts were admissible as "adopted admissions" by the Commonwealth and that their exclusion was reversible error. Furthermore, as we understand it, Lewis believes that this admission by the Commonwealth means that it had determined Horsley acted wantonly rather than intentionally, a determination that should have been presented to the jury as evidence that Lewis could not have acted intentionally. We disagree that the statements in Horsley's plea agreement constituted an admission by adoption by the Commonwealth, which disposes of both issues. Therefore, we discern no abuse of discretion in the trial court's exclusion of the plea agreement.

■■■ The standard of review on evidentiary issues is abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

The parties agree that Horsley's statements in the plea agreement are hearsay and, absent an exception, inadmissible. However, Lewis argues that Horsley's statements fall under the exception created by Kentucky Rule of Evidence (KRE) 801A(b)(2):

A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:

. . .

A statement of which the party has manifested an adoption or belief in its truth.

According to Lewis, the Commonwealth manifested an adoption and belief in the truth of Horsley's statement of facts by signing the agreement, by not challenging the statement of facts when Horsley entered his plea, and by stipulating that Horsley was armed with an assault rifle and pled guilty.

Whether the Commonwealth's actions or inactions with regard to Horsley's plea agreement and plea constituted adoption of Horsley's statement of facts is an issue of first impression. Thus, we look to other jurisdictions for guidance. We find most persuasive and adopt the reasoning set forth by the Eleventh Circuit Court of Appeals in *U.S. v. Delgado*, 903 F.2d 1495 (11th Cir. 1990). In *Delgado*, Abdul Ajami and four others were indicted on several drug related charges, including conspiracy to distribute cocaine. Prior to trial, Ajami pled guilty to "importing certain artifacts from Ecuador by means of a false or fraudulent invoice," in exchange for dismissal of the drug charges. *Id.* at 1499. The other defendants sought to introduce Ajami's plea agreement and colloquy as an admission by the Government that Ajami was not guilty of conspiracy. *Id.* They argued that, if Ajami had not conspired with anyone, they could not have conspired with him. *Id.* The district court denied the defendants' motion and the Circuit Court affirmed. *Id.* In doing so, the Court held that:

There are many factors that influence the government's decision not to prosecute a defendant on certain charges, one of the most common being the government's interest in obtaining the cooperation of the defendant as a witness against codefendants. Certainly, we cannot attribute the government's deci-

sion not to prosecute to an independent determination that the defendant is not guilty. Furthermore, by holding that the government admits innocence when it dismisses charges under a plea agreement, we would effectively put an end to the use of plea agreements to obtain the assistance of defendants as witnesses against alleged co-conspirators.

*Id.*

■ We believe this logic is sound, and applying it herein, we conclude that the trial court did not err in excluding Horsley's plea agreement. As the Government did in *Delgado,* the Commonwealth agreed to reduce charges against one participant in a crime. The record does not disclose all of the reasons why the Commonwealth reduced the charges against Horsley. However, the trial court could not say, and we cannot say, that the Commonwealth did so because it had made an independent determination that Horsley acted wantonly rather than intentionally. Thus, in this case, the Commonwealth's acceptance of Horsley's plea agreement did not amount to an admission by adoption.

■ Furthermore, even if we agreed with Lewis that the Commonwealth's actions constituted art admission by adoption, admitting evidence of Horsley's plea agreement would have created other serious problems at trial. The plea agreement reflects, at best, the Commonwealth's *opinion* that Horsley did not act intentionally. That opinion is of no more evidentiary relevance than counsel for Lewis's opinion that Lewis did not act intentionally. Even if the Commonwealth's opinion regarding Horsley's mental state constituted relevant evidence, which it does not, any such evidence would be excludable as like-

ly to mislead the jury and confuse the issues. We agree with the Court in *Delgado* that, if the evidence were admitted, the Commonwealth's attorney could testify why the charges were reduced, thus introducing a number of collateral issues likely only to confuse the jury regarding the issue of Lewis's culpability. 903 F.2d at 1499. Therefore, the trial court could have excluded Horsley's plea agreement under KRE 403 [3] as well as under KRE 801A, and we discern no abuse of discretion by the trial court.

## B. Inclusion of a "Complicity to the Act" Instruction Did Not Deprive Lewis of a Unanimous Verdict.

■ Lewis argues that the trial court's complicity instruction erroneously included a theory of complicity that was contrary to the evidence. Before we address the substance of Lewis's argument, we must address whether this issue is properly preserved for our review.

[W]hen the allegation of instructional error is that a particular instruction should have been given but was not or that it should not have been given but was given, [Kentucky Rule of Criminal Procedure] RCr 9.54 operates as a bar to appellate review unless the issue was fairly and adequately presented to the trial court for its initial consideration.

*Martin v. Commonwealth,* 409 S.W.3d 340, 346 (Ky. 2013). Thus, Lewis must establish that he fairly and adequately presented his objection regarding the complicity instruction to the trial court.

In order to understand the preservation issue, we must address the complicity statute. KRS 502.020 provides that:

3. KRE 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or

(c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:

(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or

(c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

Thus, the statute contains two types of complicity. We have previously labeled those types as: "complicity to the act" which is in section (1); and "complicity to the result" which is in section (2). *See Tharp v. Commonwealth*, 40 S.W.3d 356 (Ky. 2000).

The trial court gave the following instruction regarding intentional murder:

### INSTRUCTION NO. 1: MURDER (INTENTIONAL)

You will find the defendant, TAWAIIN LEWIS, guilty of Intentional Murder under this Instruction if, and only if, you

believe from the evidence beyond a reasonable doubt all of the following:

A. That in Jefferson County on or about the 23rd day of September, 2009, the defendant, acting alone or in complicity with another, killed **Jonte Johnson;**

AND

B. That in so doing, he caused the death of **Jonte Johnson** intentionally.[4]

The court defined complicity as follows:

(A) **Complicity:** Means that a person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he solicits, commands, or engages in a conspiracy with such other person to commit the offense, or aids, counsels, or attempts to aid such person in planning or committing the offense.

Means that a person is guilty of an offense committed by another person when, while acting wantonly with regards to the result of another's conduct, he solicits, commands, or engages in a conspiracy with such other person to engage in that conduct, or aids, counsels, or attempts to aid such person in planning or committing such conduct.

Thus, the first definition of complicity in the instructions involves complicity to the act and the second involves complicity to the result.

█ Lewis argues that the trial court erred by including the first definition of complicity in the instructions. The Commonwealth argues that this issue is not preserved for our review because Lewis did not object to the inclusion of that definition. Having reviewed the record, we agree with the Commonwealth.

---

4. Instruction No. 2 was the same, except it named Knighton as the victim.

Lewis points to the following statement made by counsel as evidence that he fairly and adequately presented the issue to the trial court:

> I understand the Commonwealth is arguing they're proceeding under section two or sub two of the accomplice statute. We don't think that there's re—the distinction, it's just as easily, uh, complicity as to the act by the way these are, are worded, and that's it's really a theory under one.

Taking the preceding at face value, Lewis was arguing that the instruction regarding complicity to the result—subsection two complicity—was improperly worded. He did not state that complicity to the act should be excluded from the instructions. Therefore, this issue was not properly preserved for our review.

■ Furthermore, regardless of preservation, Lewis's argument is substantively faulty. As we understand it, Lewis is arguing that complicity to the act should have been excluded because that provision requires that both the principal, in this case Horsley, and the accomplice, in this case Lewis, must have the same *mens rea*—intent. According to Lewis, Horsley, because he pled guilty to manslaughter rather than intentional murder, could not have had the requisite intent. The problem with this argument is three-fold.

■ First, as set forth above, the Commonwealth did not adopt Horsley's statement of the facts and therefore did not concede that Horsley acted without the requisite intent. Second, because the trial court properly excluded Horsley's plea agreement from evidence, there was no

evidence that Horsley pled to a crime with a wanton rather than an intentional *mens rea*.[5] Third, there was sufficient evidence that Lewis acted with the requisite intent. He engaged in an altercation with Jonte a week before and a few hours before the shooting. He approached the porch armed with a handgun, which he had out and gestured with. Horsley approached the porch shortly after Lewis did and, with Lewis, fired multiple bullets at the men on the porch. Furthermore, Lewis's argument that only Horsley's projectiles were found in Jonte and Knighton notwithstanding, several witnesses stated that both Lewis and Horsley fired their guns at the men on the porch. Therefore, we discern no error in the trial court's complicity instruction.

### C. The Trial Court Did Not Err By Failing to Include a Method in the Intentional Murder Instructions.

■ Lewis argues that the intentional murder instructions were defective because they did not set forth the method by which Jonte and Knighton were killed. This issue is not preserved. However, because this issue involves "unpreserved allegations of defects in the instructions that were given" rather than allegations that an instruction was given that should not have been given, we review it for palpable error. *Martin v. Com.*, 409 S.W.3d 340, 346 (Ky. 2013). We reverse under the palpable error standard only when a "manifest injustice has resulted from the error." Rule of Criminal Procedure (RCr) 10.26. The party seeking palpable error review must show that it is probable the result would have been different absent the error or that the error was "so fundamental as

---

**5.** We note that the trial court only ruled that Lewis could not introduce into evidence Horsley's plea agreement. The court did not rule that Horsley could not testify as to the contents of that agreement or as to his mental state at the time of the shooting. Furthermore, as noted by the Commonwealth, Horsley was available to testify and wanted to do so on behalf of Lewis. However, counsel for Lewis never called Horsley to testify.

to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky. 2006).

> "Kentucky has long employed the use of 'bare bones' jury instructions that avoid an abundance of detail, providing only a framework of the applicable legal principles." *Hilsmeier v. Chapman,* 192 S.W.3d 340, 344 (Ky. 2006). At a minimum, however, "[i]nstructions must be based upon the evidence and they must properly and intelligibly state the law." *Howard v. Commonwealth,* 618 S.W.2d 177, 178 (Ky. 1981). Their purpose "is ... to state what the jury must believe from the evidence ... in order to return a verdict in favor of the party who bears the burden of proof." *Webster v. Commonwealth,* 508 S.W.2d 33, 36 (Ky. 1974). In criminal cases, instructions "should conform to the language of the statute," *Parks v. Commonwealth,* 192 S.W.3d 318, 326 (Ky. 2006), and "[i]t is left to the lawyers to 'flesh out' the 'bare bones' in closing argument." *Id.*

*Wright v. Commonwealth,* 391 S.W.3d 743, 746–47 (Ky. 2012), *as modified on denial of reh'g* (Feb. 21, 2013).

KRS 507.020(1) provides that "[a] person is guilty of murder when: With intent to cause the death of another person, he causes the death of such person or of a third person...." As the Commonwealth notes, the method by which the death is caused is not an element of the statute. Therefore, setting forth in the murder instructions the method through which Lewis caused the deaths of Jonte and Knighton was not required.

We note that Lewis relies on Cooper, *Kentucky Instructions to Juries,* § 3.21 and on *Owens v. Commonwealth,* 329 S.W.3d 307 (Ky. 2011). That reliance is misplaced. Justice Cooper does recommend that the instruction for intentional murder contain a statement as to the

method used to cause death, and we have no qualms about including that in the instruction. However, nothing in the statute mandates the inclusion of method in the instruction.

Furthermore, *Owens* is easily distinguished. In *Owens,* the defendant was charged with and convicted of tampering with physical evidence under KRS 524.100. The instruction stated that the jury could convict Owens if it found that he "concealed and/or destroyed evidence." The instruction did not limit the jury's consideration to "physical evidence," as required by the statute. Although the Court determined this omission to be error, it found that the error was not palpable because it was clear what evidence Owens concealed or destroyed. Here, it is undisputed that Jonte and Knighton died as a result of multiple gunshot wounds. Therefore, even if failing to include the method of their deaths in the instruction was error, it was not palpable.

## D. The Trial Court Did Not Err By Admitting Jonte's Dying Declaration.

Jonte's grandmother testified that, after Jonte was shot, he knocked on his grandmother's apartment door and, when she came out, he said, "I'm dying. I've been shot. Chum (meaning Lewis) did it." Jonte subsequently died.

Lewis filed a motion *in limine* to exclude any testimony from Jonte's grandmother about his identification of Lewis as the shooter. The trial court denied the motion finding that the statement was a dying declaration and that it was not testimonial in nature.

As noted above, we review evidentiary rulings for abuse of discretion. *Clark v. Commonwealth,* 223 S.W.3d 90, 95 (Ky. 2007).

There is no dispute that Jonte's statement to his grandmother—"Chum did it"—is hearsay and not admissible unless it falls within an exception to KRE 803, the hearsay rule. Furthermore, there is no dispute that Jonte's statement falls within KRE 804(b)(2), which sets forth an exception to the hearsay rule for a statement made under belief of impending death. However, there is a dispute regarding how KRE 804(b)(2) and the confrontation clauses of the United States and Kentucky Constitutions interact.

In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that, hearsay exceptions notwithstanding, the testimonial statement of a declarant who does not appear at trial is not admissible unless the declarant is unavailable and the defendant had the opportunity to cross-examine him. *Id.* at 54, 124 S.Ct. 1354. We adopted *Crawford* in *Rankins v. Commonwealth*, 237 S.W.3d 128 (Ky. 2007). In *Rankins*, we also adopted the U.S. Supreme Court's subsequent analysis in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) regarding what constitutes a testimonial statement. "Where statements recount potentially criminal past events, the declarant is, for Confrontation Clause purposes, acting as a witness against the accused. More simply, statements that tell 'what is happening' are nontestimonial, while statements that tell 'what happened' are testimonial." *Rankins*, 237 S.W.3d at 131 (Ky. 2007).

If that were the end of the matter, we would agree with Lewis that admission of Jonte's dying declaration was error. However, this Court revisited the tension between the confrontation clause and the hearsay exceptions in *Hartsfield v. Commonwealth*, 277 S.W.3d 239 (2009). Hartsfield was charged with multiple sexual crimes involving three victims, including M.B., who died before trial. *Id.* at 241. Following M.B.'s death, Hartsfield moved for dismissal of all charges related to her. The trial court denied the motion and the Commonwealth filed a motion *in limine* stating that it intended to introduce evidence from a Sexual Assault Nurse Examiner regarding details of the rape that M.B. disclosed while being examined. *Id.* at 241–42. The Commonwealth also stated that it intended to introduce evidence that, immediately after being raped, M.B. ran out of her house and yelled to a passerby, "He raped me; He raped me," as Hartsfield fled. *Id.* Finally, the Commonwealth introduced evidence that M.B. then ran to her daughter's house and told her daughter that she had just been raped. *Id.* The trial court held that the statements by M.B. to these third parties were not admissible and ordered the Commonwealth to dismiss the charges related to M.B. Hartsfield then pled guilty to reduced charges as to the other victims, and the Commonwealth appealed the dismissal of the charges related to M.B. *Id.*

This Court held that the trial court properly excluded M.B.'s statements to the nurse examiner because the nurse examiner's interview of M.B. was "the functional equivalent of police questioning.... [which] involved past events, was not related to an ongoing emergency, and took on the nature of a formal interview." *Id.* at 244–45. However, this Court held that the trial court erred in excluding the statements M.B. made to her daughter and the passerby. In doing so, we noted that the statements in *Crawford*, *Davis*, and a companion case, *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), were made in response to questioning by police officers or their surrogates. *Hartsfield*, 277 S.W.3d at 243–44. However, the statements made by M.B. to her daughter and the passerby were: made

spontaneously "and unprompted by questioning ... were not formal[,] not delivered to law enforcement or its equivalent, and were in the nature of seeking help for an emergency (even though it was not ongoing)." *Id.* at 245. Thus, we concluded that the statements were not testimonial and admissible as excited utterances.

Lewis argues that this case is distinguishable from *Hartsfield* because Jonte's statements were not excited utterances. Furthermore, he argues that Jonte believed his death was imminent; therefore, the statement "Chum did it" could not have been made for the purpose of seeking help for an emergency but was made for the purpose of future prosecution. These arguments are unpersuasive for at least five reasons.

■ First, Jonte had just been shot several times and was bleeding to death; therefore, his statement can easily be characterized as both an excited utterance and a dying declaration. Second, since Jonte made the statement within a minute or two of being shot, and likely did not know where Lewis and Horsley had gone, there was clearly an ongoing emergency situation. Third, it is as likely that Jonte was trying to warn his grandmother about who was involved, as it was that he was contemplating future court proceedings. Fourth, like M.B., Jonte made his statement to a lay witness, not to the police or those working on behalf of the police. Finally, like M.B., Jonte made his statement spontaneously, not in response to questioning by anyone. Therefore, we discern no error in the trial court's admission of Jonte's statement.[6]

**E. The Commonwealth's Statements During Closing Argument in the Guilt Phase Did Not Amount to Prosecutorial Misconduct.**

In his closing argument, Lewis's attorney presented four theories of defense: (1) if Lewis had a gun, he did not fire it; (2) all of the physical evidence pointed to Horsley as the shooter and there was no evidence connecting Lewis to Horsley; (3) the shooting was not a rational response to and was so disproportional to the minimal evidence of "bad blood" between Lewis and the victims that it made no sense as a motive; and (4) Lewis could not, therefore, be convicted of either actually shooting anyone or of acting in complicity with Horsley. In support of these defenses, Lewis's counsel pointed to inconsistencies between the physical evidence and the testimony of the witnesses, inconsistencies between what the witnesses initially told police and their subsequent statements, and inconsistencies among the witnesses. The Commonwealth argued to the contrary, without objection by Lewis.

■ Lewis now argues that statements by the Commonwealth's attorney during her closing argument amounted to two types of prosecutorial misconduct: impermissibly delegating responsibility for protecting the community to the jury; and improperly expressing personal beliefs and opinions. Lewis admits that this issue is not preserved. Therefore, we review it for palpable error, reversing a conviction based on prosecutorial misconduct during closing argument only if that misconduct was flagrant. RCr 10.26; *Mayo v. Commonwealth,* 322 S.W.3d 41, 55 (Ky. 2010). With these standards in mind, we address each issue separately below.

---

**6.** The Commonwealth argues that the majority of states that have addressed the issue have decided that a dying declaration does not fall within the purview of the confrontation clause. It urges us to join those states. We decline to do so at this point because, based on the facts here and our decision in *Hartsfield,* we need not go that far.

### 1. Delegating Responsibility for Protecting the Community.

 According to Lewis the following statement by the Commonwealth's attorney improperly delegated responsibility for protecting the community to the jury warranting a reversal of his conviction:

> You know, as a prosecutor, and sort of talking to juries, I always sort of ask the question out loud, you know: Why does this matter? And it's because the lives of these people matter. Because, to their families and to this community, they are a loss. And I am telling you, if you want less gunfire that grannies have to hear in their house, then you take people like that [pointing to Lewis] off the streets. That's how you do it.

We disagree with Lewis's characterization of this argument.

 "It is unquestionably the rule in Kentucky that counsel has wide latitude while making opening or closing statements." *Brewer v. Commonwealth*, 206 S.W.3d 343, 350 (Ky. 2006). "[A] prosecutor is ... entitled to draw reasonable inferences from the evidence, as well as respond to matters raised by the defense." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005) (citations omitted).

*Mitchell* involved the sale of Oxycontin. In closing, the prosecutor described the toll that prescription drug abuse had taken on the citizens of eastern Kentucky. The prosecutor then called on the jury "to send a message to this defendant and to this community that we're going to punish drug dealers for doing what they're doing. It's time we send a message." *Id.* at 131. This Court determined that the prosecutor's comments were in response to Mitchell's closing argument that "trivialized Mitchell's actions and the dangers of Oxycontin," and, if erroneous, the error was harmless. *Id.* at 132.

Herein, Jonte's grandmother testified that she often heard gunfire in the neighborhood and that, since the shooting, she hides in her bedroom when she hears it. During his closing argument, counsel for Lewis stated that he found it disturbing that there were neighborhoods in Louisville where hearing gunfire was a common occurrence. He then stated that he hoped there were neighborhoods where "Grannies can go to bed without hearing gunfire." Thus, the prosecutor's comment was in response to defense counsel's argument, and, like the argument in *Mitchell*, if erroneous, it was harmless.

### 2. Improperly Commenting on the Evidence/Expressing Personal Opinions.

Lewis argues that, by making the following specific statements, the Commonwealth's attorney was improperly vouching for and personally commenting on witness credibility:

> I just don't know how you get more extreme than an assault rifle and a handgun.

> I believe it's intentional and I'm going to argue that to you.

> I would, I would argue to you that I don't think that it was the defendant's plan to ever have Demarcus or Dejuan or [Mitchell] come in this courtroom. I think that he intended to have every one of them die. He didn't want any witnesses. But again, this building is filled with people who make really bad decisions. So, I think the fact that these people knew him and he was so bold, is actually an indication that he intended to leave no witnesses.

> I'm also going to suggest to you that there is a third option that makes sense to me.

> And, that I personally believe that the defendant had just had enough that night. I think the evidence supports that.

I personally think that he went there, and he got that guy, because he wasn't prepared to do it. And ultimately, he's a wimp. And he got somebody else to come in there and do his dirty work for him.

You know, I think, in thinking about the testimony, it, I want you to think back about what Demarcus said because although I wasn't there, I think he's the one that sort of put it together the best.... You believed him, right? You believe him, and should base it on him.

 We agree with Lewis that a prosecutor should not personally vouch for the credibility of a witness. *See United States v. Francis,* 170 F.3d 546, 550 (6th Cir. 1999). However, the Commonwealth's attorney did not address any specific testimony of a witness in the first six statements. Furthermore, with the exception of the last statement, the Commonwealth's attorney did not state whether she personally believed or disbelieved any witness. She simply set forth inferences that the jury should draw from the evidence. It might have been better if the Commonwealth's attorney had not personalized those inferences, but the fact that she did, if it is error, is not palpable error.

 As to the last statement, Lewis's attorney spent a substantial amount of time in his closing argument pointing out the inconsistencies among the witnesses' testimony. As noted above, the Commonwealth's attorney is permitted to respond to the arguments raised by a defendant. Stating that Demarcus "put it together the best" is simply a response to Lewis's argument regarding inconsistent witness testimony and not erroneous.

## F. The Court Did Not Err By Excluding Horsley's Plea Agreement During the Penalty Phase.

 Prior to the penalty phase of the trial, Lewis again moved for admission of Horsley's plea agreement. In particular, Lewis wanted to put before the jury evidence regarding the sentence Horsley received as part of his plea agreement in order to show what a proportionate sentence would be. The Commonwealth argued that evidence of Horsley's sentence was irrelevant and that permitting the jury to hear that evidence would open the door to significant extraneous evidence regarding how and why the parties entered into the agreement. The trial court denied Lewis's motion finding that Horsley's plea agreement and sentence were not relevant and that the jury was aware of Horsley's role. On appeal, Lewis argues that due process and KRS 532.025 require the admission of the details of Horsley's plea agreement. We disagree.

 Initially, we must address our standard of review. Lewis argues that this is an issue of statutory interpretation, which we review *de novo.* The Commonwealth argues that this not an issue of statutory interpretation but one regarding the admission of evidence, which is abuse of discretion. We agree with the Commonwealth.

KRS 532.025 provides in pertinent part that:

(2) In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances .... otherwise authorized by law and any of the following statutory ... mitigating circumstances which may be supported by the evidence:

5. The defendant was an accomplice in a capital offense committed by another person and his participation in the capital offense was relatively minor ....

The statute addresses the appropriate jury instructions, not what evidence must,

or even should, be admitted. The trial court provided the jury with an instruction consistent with the statute; therefore, it complied with the statutory requirement.

As set forth above, the trial court has the discretion regarding what evidence is or is not admissible. Having reviewed the record, and for the reasons set forth regarding the exclusion of this evidence during the guilt phase, we discern no error in the trial court's exclusion of it in the penalty phase.

### IV. CONCLUSION.

For the foregoing reasons, we affirm.

All sitting. All concur.